**PORTER | SCOTT**
A PROFESSIONAL CORPORATION
John R. Whitefleet, SBN 213301
Brandon Gnekow, SBN 306669
350 University Avenue, Suite 200
Sacramento, California 95825
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendants JIM DENNEY (erroneously sued as JIM DENNY), Sheriff J. PAUL PARKER, Correctional Lieutenant NORMAN BIDWELL, Doctor SAMUEL SAUNDERS, Nurse DORIS BROWN (erroneously sued as DORRIS BROWN), and COUNTY OF SUTTER (also sued as SUTTER COUNTY SHERIFF'S DEPARTMENT and SUTTER COUNTY JAIL)

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID G. LEONARD, and EDUARDO MARQUEZ (a minor child),<br><br>            Plaintiff,<br><br>v.<br><br>JIM DENNEY, Sheriff, (County of Sutter); J. PAUL PARKER, Sheriff (County of Sutter); Officer BIDWELL (Sutter County Jail Commander); John Doe (No. 1), Custody Officer (Sutter County Jail); SAMUEL SAUNDERS, Medical Doctor (Sutter County Jail); DORIS BROWN, Nurse Practitioner (Sutter County Jail); SUTTER COUNTY SHERIFF'S DEPARTMENT; SUTTER COUNTY JAIL; and COUNTY OF SUTTER,<br><br>            Defendants. / | Case No: 2:12-cv-00915 TLN AC P<br><br>**DECLARATION OF JOHN WHITEFLEET IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**No hearing pursuant Local Rule 230(l)**<br><br>Second Complaint filed: 09/25/14 |

I, John R. Whitefleet, declare:

1.      I am an attorney at law licensed to practice in all the courts of the State of California and am a shareholder with the law firm of Porter Scott, attorneys of record for Defendants. The facts stated in this declaration are within my personal knowledge and if called to testify, I could and would competently testify to them.

1

2.      Attached hereto as **Exhibit A** are true and correct copies of excerpts from the transcript of the Deposition of Plaintiff DAVID G. LEONARD completed on July 12, 2016.

3.      Attached hereto as **Exhibit B** are true and correct copies of Plaintiff's Notice of Claims Letters (Supplemental Requested Information) sent we received on August 26, 2016, in response to written discovery requests.

I declare under penalty of perjury pursuant to the laws of the State of California and the United States that the foregoing is true and correct.

This declaration was executed on this 1 day of February 2018, in Sacramento, California

Dated: August 27, 2018                    Respectfully submitted,

                                          PORTER SCOTT
                                          A PROFESSIONAL CORPORATION

                                          By /s/ John R. Whitefleet
                                            John R. Whitefleet
                                            Attorney for Defendant

**DECLARATION OF JOHN WHITEFLEET IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
{01747249.DOC}

Exhibit A

1            UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    - - -

4    DAVID G. LEONARD,                )
                                      )
5              Plaintiff,             )
                                      )
6         vs.                         )  No.: 2:12-cv-0915 TLN ACP
                                      )
7    JIM DENNY, et al.,               )
                                      )
8              Defendants.            )
     - - - - - - - - - - - - - - - - )

9

10

11

12

13

14

15                    DEPOSITION OF

16                  DAVID G. LEONARD

17                  CHINO, CALIFORNIA

18                  JULY 12, 2016

19

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     www.depo.com

23

24   REPORTED BY:  Arleen Jimenez, CSR NO. 4240

25   FILE NO: AA06742

1

Atkinson-Baker Court Reporters
www.depo.com

1           UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF CALIFORNIA

3                     - - -

4  DAVID G. LEONARD,                )
                                    )
5             Plaintiff,            )
                                    )
6      vs.                          )  No.: 2:12-cv-0915 TLN ACP
                                    )
7  JIM DENNY, et al.,               )
                                    )
8             Defendants.           )
   - - - - - - - - - - - - - - - - -)

9

10

11

12

13

14

15          Deposition of DAVID G. LEONARD, taken on

16  behalf of Defendant, at 14901 Central Avenue, Chino,

17  California, 91710, commencing at 9:17 a.m., Tuesday,

18  July 12, 2016, before Arleen Jimenez, CSR No. 4240.

19

20

21

22

23

24

25

2

David G. Leonard
July 12, 2016

```
 1              A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3    DAVID G. LEONARD
      (In Propria Persona)
 4    14901 Central Avenue
      Chino, California 91710
 5    (909) 597-1821

 6

      FOR THE DEFENDANT:
 7
      PORTER SCOTT APC
 8    BY:   JOHN R. WHITEFLEET, ESQ.
      350 University Avenue
 9    Suite 200
      Sacramento, California 95825
10    (916) 929-1481

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1                        I N D E X

 2   WITNESS:  DAVID G. LEONARD

 3   EXAMINATION:                                    PAGE

 4        By Mr. Whitefleet                            6

 5

 6   EXHIBITS
                           DEFENDANTS'
 7   NUMBER                DESCRIPTION              PAGE
```

| Number | Description | Page |
|---|---|---|
| 1 | Letter to Lt. Bidwell, 8-11-09 | 55 |
| 2 | Correspondence, 7-29-09 | 56 |
| 3 | Sutter County Sheriff's Department Classification Contract, 6-18-09 | 61 |
| 4 | Inmate Request Form, 6-28-09 | 102 |
| 5 | Inmate request form, 7-1-09 | 103 |
| 6 | Inmate request form, 7-10-09 | 104 |
| 7 | Inmate request form, 7-10-09 | 104 |
| 8 | Inmate request form, 7-14-09 | 106 |
| 9 | Inmate request form, 7-16-09 | 107 |
| 10 | Inmate request form, 7-17-09 | 107 |
| 11 | Inmate request form, 7-26-09 | 107 |
| 12 | Inmate request form, 7-21-09 | 108 |
| 13 | Inmate request form, 7-21-09 | 110 |
| 14 | Inmate request form, 8-2-09 | 111 |
| 15 | Inmate request form, 8-22-09 | 112 |
| 16 | Inmate request form, 9-9-09 | 112 |
| 17 | Inmate request form, 9-11-09 | 113 |

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    I N D E X (CONTINUED)

 2
       EXHIBITS
 3                                DEFENDANTS'
       NUMBER                     DESCRIPTION                PAGE
 4
        18       Inmate request form, 9-18-09                113
 5
        19       Inmate request form, 12-26-09               113
 6
        20       Inmate request form, 2-17-10                114
 7
        21       Inmate request form for barber              114
 8
        22       Inmate request form, 8-21-09                114
 9
        23       Inmate request form, 7-28-10                115
10
        24       Inmate request forms, 3-22-10,              115
11               3-8-10, 1-14-10

12
       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13
            (None)
14

15     INFORMATION TO BE SUPPLIED:

16          (None)

17

18

19

20

21

22

23

24

25
```

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1          CHINO, CALIFORNIA, TUESDAY, JULY 12, 2016

 2                      9:17 A.M.

 3                       -oOo-

 4

 5              DAVID G. LEONARD,

 6         having first been duly sworn, was

 7         examined and testified as follows:

 8

 9                     EXAMINATION

10  BY MR. WHITEFLEET:

11      Q    Would you please state your full name, spell your

12  last name for the record?

13      A    David Gerald Leonard, L-e-o-n-a-r-d.

14      Q    And, Mr. Leonard, as I introduced myself off

15  record, my name is John Whitefleet.  I represent the

16  county defendants and all the other defendants that are

17  named in this case.  And you understand you are here today

18  to give your testimony under oath in connection with the

19  Sutter County case?

20      A    Yes.

21      Q    Have you ever had your deposition taken before?

22      A    I've only been to a deposition, like, once and

23  that was back in 2001, I think.

24      Q    What was in connection --

25      A    Motor vehicle accident that originally injured my
```

6

1    going to butcher this name, but De Heuval became your

2    attorney?

3         A    Mr. Van Den Heuval, yes.

4         Q    Van Den Heuval?

5         A    If I go back to the court transcripts or such, I

6    could get a date for you.

7         Q    But you were represented by a criminal defense

8    attorney during the entire time you were incarcerated at

9    Sutter County Jail?

10        A    Yes.

11        Q    All right.  So, tell me about this 2000 car

12   accident.

13        A    My foster son and I had attended a search and

14   rescue training meeting in Nevada County and we were

15   returning home coming down the highway.  I had slowed down

16   for an intersection near the Rough and Ready Highway and I

17   got a green light.  So, I let off the brake and just

18   started to coast back up to speed.

19            A guy blew the light and hit us almost head-on.

20   And he was in a large dually truck and pushed us clear

21   back through the intersection and pretty well totalled my

22   new vehicle.

23        Q    Were you hospitalized?

24        A    I was not hospitalized at the time, but the next

25   morning, I had to go to the hospital when my doctor -- I

27

Atkinson-Baker Court Reporters
www.depo.com

1   couldn't tie my shoes or really move around, so I had to
2   go in.
3         Q    So, at some point, were you hospitalized post
4   accident?
5         A    I didn't actually get admitted.  They did a lot
6   of tests, X-rays and such.  My primary care physician in
7   Marysville, at the time, took care of most everything and
8   then he ordered tests and so forth.
9         Q    Any surgery as a result of the car accident?
10        A    I did not have surgery.  I had surgical injection
11   for cortisone, which was an epidural near L4-L5.
12   Underwent pretty aggressive physical therapy.
13        Q    For what?
14        A    Basically, a low back condition.
15        Q    Did any physician, as a result of that car
16   accident, diagnose you with any particular injury to your
17   back?
18        A    The injury was related to L4-L5 and I had a
19   vertebra that was displaced and.  I don't recall if, at
20   that point or shortly later, they mentioned stenosis,
21   basically, which is like a root nerve impingement,
22   basically, L4-L5.
23        Q    Did any physician actually say that you had a
24   vertebra displaced as a result of that car accident?
25        A    In those specific terms, I can't say that he did.

28

Atkinson-Baker Court Reporters
www.depo.com

1   severe enough that my cellmate actually had to contact

2   medical and they did, like, a man down.  Other than that,

3   usually, it was just reported verbally to the nurse when

4   she would come in and fill out med slips and when I would

5   talk to the medical staff, I would inform them of how it's

6   doing.

7       Q    So, are you able to estimate for me -- well,

8   let's go back for a second.  You were incarcerated at

9   Sutter County Jail between June 18, 2009 to,

10  approximately, what, April 5th, 2010?

11      A    Correct.

12      Q    That's about a ten-month period?

13      A    That sounds correct, yes.

14      Q    Did you have more than one asthma attack per

15  month?

16      A    I was, sort of, in an ongoing -- when I first

17  arrived, I didn't have any problems.  I made them aware of

18  the allergies that I did have.  I don't remember the exact

19  onset, but at some point, I started suffering the

20  respiratory issues.  I believe there's a few medical slips

21  that I filed specific to that.

22      Q    Are you able to estimate for me, with any

23  particular range, the number of asthma attacks you believe

24  that you experienced while at Sutter County Jail over

25  that, approximate, ten-month period?

David G. Leonard
July 12, 2016

1           There was some just generalized medical, but I

2     don't recall all the specifics of any of the appeals.

3        Q    Any grievance form submitted relating to your

4     lower back while at Avenal?

5        A    I believe so.  I don't know how many.

6        Q    And how about while here at Chino?

7        A    I believe, one, possibly more.

8        Q    At some point, you also had indicated that you

9     had an infection in your right eye?

10       A    Yes.

11       Q    Has that resolved?

12       A    The infection resolved.  I have permanent scar

13     tissue in the eye.

14       Q    When did the infection resolve?

15       A    I don't know the exact date.  I had, basically,

16     an active infection when I saw Dr. Amin, which was while I

17     was at Sutter County, and I never saw the specialist

18     again.

19       Q    Can you give me an approximation as to when the

20     infection in your right eye resolved?

21       A    No.  There's --

22       Q    Was it --

23       A    I can say that, within a week to two weeks, the

24     vision started to clear up, but they never sent me back to

25     him or UC Davis, so I have no way of knowing exactly when

Atkinson-Baker Court Reporters
www.depo.com

1       the infection ended.    They continued treating it the whole

2       time.

3           Q       So you're saying, within a week to two weeks of

4       getting the eye drops, your vision cleared?

5           A       When I first thought that I was having an active

6       infection, I couldn't see the cell door from here to the

7       wall, which is probably eight, nine feet from my position

8       here.

9                   That's why I started pushing medical to see a

10      specialist.   When I saw the specialist, which was

11      Dr. Amin, he confirmed that I, basically, had an active

12      infection and he started treating that.   The jail --

13      according to Dr. Amin and what I have so far, I was

14      supposed to go back to UC Davis, but that was never set

15      up.

16                  So, from the time I saw Dr. Amin until the time I

17      was transferred, the jail continued the drops and they

18      continued a prophylactic medication, an antiviral and that

19      was either Valtrex or Acyclovir.

20          Q       You're saying, though, that once you saw

21      Dr. Amin, within a week or two weeks, your vision cleared?

22          A       The blurriness cleared, which was one of the

23      first symptoms that, you know, I realized there was a

24      substantial problem.   I don't know that the infection

25      cleared.

46

David G. Leonard
July 12, 2016

```
 1    infection.  One was a steroid drop.  I believe that's
 2    Prednisolone, which is a Prednisone-type steroid.  Xibrom
 3    was another and I don't recall the third off the top of my
 4    head.
 5        Q    Was it Trifluridine?
 6        A    Trifluridine, I believe.
 7             MR. WHITEFLEET:  T-r-i-f-l-u-r-i-d-i-n-e.
 8    BY MR. WHITEFLEET:
 9        Q    All right.  So, you got -- while at Sutter, you
10    were prescribed these three different types of drops at
11    Sutter.  And did you continue to receive those three types
12    of drops up until your transfer to CDCR?
13        A    Yes.
14        Q    Okay.  And you had mentioned that there's scar
15    tissue in your right eye.  Who diagnosed you with scar
16    tissue in your right eye?
17        A    Initially, UC Davis was the first one to indicate
18    that there was any type of scar tissue in the eye.
19        Q    And when was that?
20        A    I want to say 2002-2003.
21        Q    Did they say -- strike that.
22             Was it a physician at UC Davis that told you in
23    2002-2003 time frame that you had scar tissue in your
24    right eye?
25        A    That I had some, yes.
```

51

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      Q      Okay.  Did the doctors at UC Davis, in the

2   2002-2003 time frame, tell you the reason for that scar

3   tissue?

4      A      Yes.

5      Q      What was that?

6      A      In 2002, I had Lasix in my right eye.

7   Approximately, six months post-op, we thought that the eye

8   wasn't -- you know, that it was regressing, which is

9   common in many cases.  But when the sight continued to

10  deteriorate, I saw a local eye person, who was mainly an

11  optometrist that had some additional training, and he

12  thought that I might have a serious infection.

13             He contacted a friend, who was a local

14  ophthalmologist, who I saw.  And within minutes of seeing

15  him, he confirmed that I had a serious infection; I needed

16  to see my surgeon right away.

17             So, I went back to Sacramento, to the surgeon,

18  and before I got back to Yuba City, UC Davis was

19  contacting me to head back to Sacramento to their

20  ophthalmology department.

21      Q      This was also in 2002-2003?

22      A      Yes.

23      Q      What kind of infection was it back then?

24      A      It was a herpes simplex keratitis.  And it had

25  exacerbated to somewhere up, like, in 20/400, 500 type

52

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1   vision loss in the eye.

2       Q    All right.  So, in the 2002-2003 time frame,

3   what's your understanding of the treatment that you were

4   provided at that time?

5       A    UC Davis started me on Acyclovir.  It was not

6   only a prophylactic, but a higher dose to bring down the

7   infection.  They prescribed eye drops.  I don't recall the

8   specific ones at this point or how many times a day or

9   such.

10          And, after a period of time, we got the vision

11  back to the 20/40, 20/50 range, to the best of my memory.

12  They mentioned that I'll have some scar tissue there

13  permanently.  It's sort of like looking through a blurry

14  window.

15          I want to say the scar tissue is just off center

16  of the center of my eye a little bit.  And they're the

17  ones that advised me that, if I started feeling any of

18  these symptoms, such as a rapid change in blurriness of

19  the eye, etcetera, that I needed to get back to them or

20  get medical help right away.

21      Q    So, were you prescribed corrective lenses,

22  glasses back in 2002-2003 after the treatment of the

23  infection?

24      A    No.  I was informed that glasses won't be

25  effective for that.  I did have a slight astigmatism,

53

David G. Leonard
July 12, 2016

1   going to butcher this name, but De Heuval became your

2   attorney?

3      A   Mr. Van Den Heuval, yes.

4      Q   Van Den Heuval?

5      A   If I go back to the court transcripts or such, I

6   could get a date for you.

7      Q   But you were represented by a criminal defense

8   attorney during the entire time you were incarcerated at

9   Sutter County Jail?

10     A   Yes.

11     Q   All right.  So, tell me about this 2000 car

12  accident.

13     A   My foster son and I had attended a search and

14  rescue training meeting in Nevada County and we were

15  returning home coming down the highway.  I had slowed down

16  for an intersection near the Rough and Ready Highway and I

17  got a green light.  So, I let off the brake and just

18  started to coast back up to speed.

19         A guy blew the light and hit us almost head-on.

20  And he was in a large dually truck and pushed us clear

21  back through the intersection and pretty well totalled my

22  new vehicle.

23     Q   Were you hospitalized?

24     A   I was not hospitalized at the time, but the next

25  morning, I had to go to the hospital when my doctor -- I

Atkinson-Baker Court Reporters
www.depo.com

1    couldn't tie my shoes or really move around, so I had to

2    go in.

3        Q    So, at some point, were you hospitalized post

4    accident?

5        A    I didn't actually get admitted.  They did a lot

6    of tests, X-rays and such.  My primary care physician in

7    Marysville, at the time, took care of most everything and

8    then he ordered tests and so forth.

9        Q    Any surgery as a result of the car accident?

10       A    I did not have surgery.  I had surgical injection

11   for cortisone, which was an epidural near L4-L5.

12   Underwent pretty aggressive physical therapy.

13       Q    For what?

14       A    Basically, a low back condition.

15       Q    Did any physician, as a result of that car

16   accident, diagnose you with any particular injury to your

17   back?

18       A    The injury was related to L4-L5 and I had a

19   vertebra that was displaced and.  I don't recall if, at

20   that point or shortly later, they mentioned stenosis,

21   basically, which is like a root nerve impingement,

22   basically, L4-L5.

23       Q    Did any physician actually say that you had a

24   vertebra displaced as a result of that car accident?

25       A    In those specific terms, I can't say that he did.

28

David G. Leonard
July 12, 2016

```
 1    severe enough that my cellmate actually had to contact
 2    medical and they did, like, a man down.  Other than that,
 3    usually, it was just reported verbally to the nurse when
 4    she would come in and fill out med slips and when I would
 5    talk to the medical staff, I would inform them of how it's
 6    doing.
 7        Q    So, are you able to estimate for me -- well,
 8    let's go back for a second.  You were incarcerated at
 9    Sutter County Jail between June 18, 2009 to,
10    approximately, what, April 5th, 2010?
11        A    Correct.
12        Q    That's about a ten-month period?
13        A    That sounds correct, yes.
14        Q    Did you have more than one asthma attack per
15    month?
16        A    I was, sort of, in an ongoing -- when I first
17    arrived, I didn't have any problems.  I made them aware of
18    the allergies that I did have.  I don't remember the exact
19    onset, but at some point, I started suffering the
20    respiratory issues.  I believe there's a few medical slips
21    that I filed specific to that.
22        Q    Are you able to estimate for me, with any
23    particular range, the number of asthma attacks you believe
24    that you experienced while at Sutter County Jail over
25    that, approximate, ten-month period?
```

36

Atkinson-Baker Court Reporters
www.depo.com

1          There was some just generalized medical, but I

2     don't recall all the specifics of any of the appeals.

3        Q     Any grievance form submitted relating to your

4     lower back while at Avenal?

5        A     I believe so.  I don't know how many.

6        Q     And how about while here at Chino?

7        A     I believe, one, possibly more.

8        Q     At some point, you also had indicated that you

9     had an infection in your right eye?

10       A     Yes.

11       Q     Has that resolved?

12       A     The infection resolved.  I have permanent scar

13    tissue in the eye.

14       Q     When did the infection resolve?

15       A     I don't know the exact date.  I had, basically,

16    an active infection when I saw Dr. Amin, which was while I

17    was at Sutter County, and I never saw the specialist

18    again.

19       Q     Can you give me an approximation as to when the

20    infection in your right eye resolved?

21       A     No.  There's --

22       Q     Was it --

23       A     I can say that, within a week to two weeks, the

24    vision started to clear up, but they never sent me back to

25    him or UC Davis, so I have no way of knowing exactly when

45

1    the infection ended.   They continued treating it the whole

2    time.

3        Q    So you're saying, within a week to two weeks of

4    getting the eye drops, your vision cleared?

5        A    When I first thought that I was having an active

6    infection, I couldn't see the cell door from here to the

7    wall, which is probably eight, nine feet from my position

8    here.

9            That's why I started pushing medical to see a

10   specialist.   When I saw the specialist, which was

11   Dr. Amin, he confirmed that I, basically, had an active

12   infection and he started treating that.   The jail --

13   according to Dr. Amin and what I have so far, I was

14   supposed to go back to UC Davis, but that was never set

15   up.

16           So, from the time I saw Dr. Amin until the time I

17   was transferred, the jail continued the drops and they

18   continued a prophylactic medication, an antiviral and that

19   was either Valtrex or Acyclovir.

20       Q    You're saying, though, that once you saw

21   Dr. Amin, within a week or two weeks, your vision cleared?

22       A    The blurriness cleared, which was one of the

23   first symptoms that, you know, I realized there was a

24   substantial problem.   I don't know that the infection

25   cleared.

46

1    infection.   One was a steroid drop.   I believe that's

2    Prednisolone, which is a Prednisone-type steroid.   Xibrom

3    was another and I don't recall the third off the top of my

4    head.

5        Q     Was it Trifluridine?

6        A     Trifluridine, I believe.

7              MR. WHITEFLEET:   T-r-i-f-l-u-r-i-d-i-n-e.

8    BY MR. WHITEFLEET:

9        Q     All right.   So, you got -- while at Sutter, you

10   were prescribed these three different types of drops at

11   Sutter.   And did you continue to receive those three types

12   of drops up until your transfer to CDCR?

13       A     Yes.

14       Q     Okay.   And you had mentioned that there's scar

15   tissue in your right eye.   Who diagnosed you with scar

16   tissue in your right eye?

17       A     Initially, UC Davis was the first one to indicate

18   that there was any type of scar tissue in the eye.

19       Q     And when was that?

20       A     I want to say 2002-2003.

21       Q     Did they say -- strike that.

22             Was it a physician at UC Davis that told you in

23   2002-2003 time frame that you had scar tissue in your

24   right eye?

25       A     That I had some, yes.

Atkinson-Baker Court Reporters
www.depo.com

1      Q    Okay.  Did the doctors at UC Davis, in the

2   2002-2003 time frame, tell you the reason for that scar

3   tissue?

4      A    Yes.

5      Q    What was that?

6      A    In 2002, I had Lasix in my right eye.

7   Approximately, six months post-op, we thought that the eye

8   wasn't -- you know, that it was regressing, which is

9   common in many cases.  But when the sight continued to

10  deteriorate, I saw a local eye person, who was mainly an

11  optometrist that had some additional training, and he

12  thought that I might have a serious infection.

13          He contacted a friend, who was a local

14  ophthalmologist, who I saw.  And within minutes of seeing

15  him, he confirmed that I had a serious infection; I needed

16  to see my surgeon right away.

17          So, I went back to Sacramento, to the surgeon,

18  and before I got back to Yuba City, UC Davis was

19  contacting me to head back to Sacramento to their

20  ophthalmology department.

21     Q    This was also in 2002-2003?

22     A    Yes.

23     Q    What kind of infection was it back then?

24     A    It was a herpes simplex keratitis.  And it had

25  exacerbated to somewhere up, like, in 20/400, 500 type

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    vision loss in the eye.

2        Q    All right.  So, in the 2002-2003 time frame,

3    what's your understanding of the treatment that you were

4    provided at that time?

5        A    UC Davis started me on Acyclovir.  It was not

6    only a prophylactic, but a higher dose to bring down the

7    infection.  They prescribed eye drops.  I don't recall the

8    specific ones at this point or how many times a day or

9    such.

10           And, after a period of time, we got the vision

11   back to the 20/40, 20/50 range, to the best of my memory.

12   They mentioned that I'll have some scar tissue there

13   permanently.  It's sort of like looking through a blurry

14   window.

15           I want to say the scar tissue is just off center

16   of the center of my eye a little bit.  And they're the

17   ones that advised me that, if I started feeling any of

18   these symptoms, such as a rapid change in blurriness of

19   the eye, etcetera, that I needed to get back to them or

20   get medical help right away.

21       Q    So, were you prescribed corrective lenses,

22   glasses back in 2002-2003 after the treatment of the

23   infection?

24       A    No.  I was informed that glasses won't be

25   effective for that.  I did have a slight astigmatism,

53

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    care?

 2         A     I don't know who specifically made that decision.

 3         Q     Okay.  So, you had indicated that, at some point,

 4    you were aware Doris Brown had, in fact, made a request on

 5    your behalf to have an MRI done?

 6         A     Yes.

 7         Q     Okay.  And did anyone tell you what that process

 8    was in going about requesting an MRI?

 9         A     Not other than that they needed to make the

10    request.

11         Q     Okay.  Did she say who she needed to make the

12    request to?

13         A     No.

14         Q     And then you had said that nurse brown had, at

15    some point, told you that she had requested a referral to

16    a specialist of some sort?

17         A     Yes.

18         Q     Okay.  And what specialist -- what was your

19    understanding of that referral?

20         A     That the referral requested me to see a

21    specialist.  I'm not sure whether that specialist was an

22    orthopedic surgeon, neurosurgeon or neurologist.  It could

23    have been any one of the three.

24         Q     Was it your understanding that referral was

25    intended to address your lower back --
```

83

David G. Leonard
July 12, 2016

1    appear to be your handwriting.

2         A    No.   I actually know the author of this.

3         Q    But this is not you?

4         A    No.   He actually wrote some things for me when I

5    couldn't write because I couldn't see, but it's not me,

6    no.

7         Q    Okay.   So, did this inmate write this on your

8    behalf?

9         A    I believe that was on his own behalf.

10        Q    Okay.

11        A    I don't believe it was related to me.   He had a

12   leg injury.

13        Q    Okay.   So, we will mark --

14        A    And this is the one I think you also sent me in

15   your admissions.

16        Q    Yes, it is.

17             MR. WHITEFLEET:   We'll mark this Exhibit 1 to

18   this deposition.   It's a letter dated August 11th, 2009.

19             (Exhibit 1 marked.)

20   BY MR. WHITEFLEET:

21        Q    So, this is a four-page document.   I'll hand that

22   to you.

23             Is that correspondence that you wrote to

24   Lieutenant Bidwell?

25        A    Yes, it is.

55

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1          Okay.  So, you had an opportunity to fully read

2   Exhibit 2?

3      A    Yes.

4      Q    And did it have anything to do with any concerns

5   about medical care, conditions of the jail or anything of

6   that sort?

7      A    No.

8      Q    Okay.  All right.  So, this letter then only

9   addressed your concern about access to the law library for

10  legal research?

11     A    Yes.  And would it be a good time for me to make

12  a small correction to something we went over earlier?

13     Q    Sure.

14     A    You asked me earlier if I was represented by

15  counsel during the entire time of incarceration.  There

16  was a short term I was not, and I believe that

17  corresponded with this while I was getting rid of one

18  attorney and having another attorney appointed.

19     Q    Okay.  Thank you.  All right.  So now, regarding

20  Exhibit 1, the August 11, 2009, I want to ask you to read

21  this into the record.

22     A    Okay.

23     Q    Since the copy that I have here is a color copy

24  and it's the best that we could do, but I want to make

25  sure that, if there's any issue with clarity, that I have

57

David G. Leonard
July 12, 2016

1    a clean understanding of what you wrote.

2         A    Okay.

3         Q    If you could just start with "Mr. Bidwell."

4         A    Starting at "Mr. Bidwell."  "I wanted to thank

5    you for your assistance with regards to the law library

6    repairs and your prompt follow-up.  I appreciate it

7    greatly.  I also felt that" you were -- correction.  "Your

8    response regarding the issue was handled very

9    professionally.  I only had one other issue which I would

10   like to address; however, I'm unsure of the proper process

11   or method to address the matter.  I do not want to cause

12   any problems and did not want to file a grievance unless

13   necessary.  I decided to first attempt to address this

14   informally by letter.  I felt, as the supervising

15   authority, you would also be the person responsible for

16   supervising compliance with California Administrative Code

17   Title 15."

18        Q    Okay.  Page 2.

19        A    "I know the medical staff generally operates

20   within the jail; however, not directly under your

21   authority.  My primary concern is regarding a medical

22   condition (HSK-viral infection of my right eye).  During

23   assessment with the doctor, I provided a history for this

24   condition.  Since I entered custody, this infection has

25   gone active (noncontagious) resulting in distortion of

Atkinson-Baker Court Reporters
www.depo.com

1   vision and increased eye pressure.  As I alerted medical

2   staff, I had been treated by University California at

3   Davis, Sacramento Medical Facility for this condition.  I

4   was also informed that if the condition became active and

5   remained untreated, it would result in irreversible damage

6   and scarring to my eye.  Furthermore, this distortion

7   creates dizziness and headaches.  I discussed this with

8   the doctor on 07-15-09 and followed up with a med slip

9   during that week.  When I received no response, I filed a

10  second med slip on 07-30-09, approximately, one week

11  later.  I filed a third med slip on 08-05-09.  On

12  08-06-09, when receiving morning medications, I received

13  the last med slip back with a lecture not to fill out any

14  more med slips with this issue (by nurse, A-pod).  As of

15  this date, I have received no assessment or appointment

16  regarding this medical condition.  To my knowledge," and I

17  can't see what's under the fold, "attempt has been made to

18  obtain my medical" --

19       Q    Going on to page 3, starting "records" on page 3.

20       A    -- "records or start precautionary medications.

21  I have waited weeks with deteriorating vision in my right

22  eye and am already concerned that some of this vision loss

23  will be permanent due to a lack of care to date.  I

24  understand that, while in custody, it is hard to mitigate

25  the pain and care for my low-back injury.  In custody, I

59

David G. Leonard
July 12, 2016

1    do not have access to physical therapy, use of my TENS

2    unit, hot/cold therapy, use of a back support or more

3    aggressive medications.  The jail doctor is providing

4    Motrin three times daily to reduce some cramping, spasms

5    and pain.  It has helped some; however, as my prior

6    cortisone (surgical injection) wears off, those symptoms

7    will continue to worsen.  She had ordered a second

8    mattress, which was declined by custody officer.  The only

9    way to manage this condition will be to arrange a surgical

10   injection, cortisone, or surgical corrective procedure.

11   The jail doctor had indicated she would try to get me to

12   the surgery center for an injection back on 06-24-09.  As

13   indicated above, due to the potential loss of permanent

14   vision, my current eye condition would be considered an

15   urgent or emergency matter, and my low back condition,

16   although painful, is not as urgent of an issue."

17       Q    Then "if" is the last word on page 3.

18       A    "If possible, I would appreciate your assistance

19   in acquiring the necessary medical attention to address my

20   medical conditions.  A second mattress may help, but

21   proper medical care is essential within a timely manner.

22   Please let me know if there is another procedure in which

23   to properly address these concerns and the standard of

24   care.  Please provide the supervising medical officer

25   contact for Sutter County Health Department, as necessary

60

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    to resolve and medical personnel or standards of care

2    issues.   Thank you in advance for your cooperation and

3    assistance resolving this matter.   Respectfully, David

4    Leonard, SC number" I believe it's 62 -- can't quite make

5    it out.

6        Q    That's okay.   All right.   Thank you for reading

7    that.

8             So, you said, in the letter in Exhibit 1, that

9    you did not want to file a grievance unless necessary.   My

10   question to you is, so, you were aware of the grievance

11   process at that point?

12       A    At that point, I had been made aware of it, yes.

13       Q    In fact, you had been given the inmate handbook

14   at the time of booking; is that correct?

15       A    I believe so.   When I first went in, there was

16   some -- it wasn't like a regular process again and then I

17   got into the cell.   But, at some point, I did see the

18   orientation book.

19            (Exhibit 3 marked.)

20   BY MR. WHITEFLEET:

21       Q    Okay.   Marked as Exhibit 3 a document that

22   indicates the Bates stamp Leonard 94 on the bottom and it

23   says, "Sutter County Sheriff's Department Classification

24   Contract" dated June 18th, 2009.

25            Have you take a look at that and ask you, once

David G. Leonard
July 12, 2016

1   she indicated that it hadn't.  And then she requested

2   certain items.  One, I believe, is the MRI and some type

3   of a specialist follow-up either orthopedic, neurosurgeon

4   or neurologist, and I believe it was also related to the

5   injection of cortisone.  Those three were all, certainly,

6   together.

7        Q    And did Doris Brown tell you that the sheriff had

8   disapproved the cost?

9        A    It was another nurse there that indicated that

10  custom or policy had been in place since Denny was there,

11  but not -- Doris Brown didn't specifically address the

12  fact the sheriff was the one who denied anything.

13       Q    Okay.  So, let me make sure I understand.  Did

14  Doris Brown ever tell you that Sheriff Denny denied

15  particular medical care because of costs?

16       A    No.

17       Q    All right.  Another -- some other nurse that you

18  can't remember the name, said that there was some practice

19  to do what?

20       A    Said that, because of expense, they wouldn't

21  approve things and that that policy had been in place

22  since Denny was there is sort of how they worded it.

23       Q    And who is it that they -- did she say who "they"

24  was that wouldn't approve?

25       A    No, she did not.

81

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      Q     Okay.  So, did she say what the approval process

2   was.

3      A     No.

4      Q     Did she say that Sheriff Denny had to approve

5   particular medical costs?

6      A     She said that they had to approve.

7      Q     And do you know who "they" is?

8      A     They never spec -- one person or another.

9      Q     Did you ever learn who "they" was?

10      A     I asked one of the medical staff when I was in

11   the office what the process was as far as recommending

12   specialist services, but all I was told was that they had

13   to request them.

14      Q     Again, do you know who "they" is?

15      A     No.

16      Q     So, are you aware of any decisions that Sheriff

17   Denny made specific to your care?

18      A     No.  Only the general deal that the sheriff is

19   ultimately responsible for the inmates within his care.

20   That's the only --

21      Q     Okay.  All right.  Are you aware of any decisions

22   that Sheriff Parker made about your medical care?

23      A     Not specific to my medical care, no.

24      Q     Did he make any specific decisions about whether

25   to approve costs or not approve costs related to medical

82

David G. Leonard
July 12, 2016

1    care?

2        A    I don't know who specifically made that decision.

3        Q    Okay.  So, you had indicated that, at some point,

4    you were aware Doris Brown had, in fact, made a request on

5    your behalf to have an MRI done?

6        A    Yes.

7        Q    Okay.  And did anyone tell you what that process

8    was in going about requesting an MRI?

9        A    Not other than that they needed to make the

10   request.

11       Q    Okay.  Did she say who she needed to make the

12   request to?

13       A    No.

14       Q    And then you had said that nurse brown had, at

15   some point, told you that she had requested a referral to

16   a specialist of some sort?

17       A    Yes.

18       Q    Okay.  And what specialist -- what was your

19   understanding of that referral?

20       A    That the referral requested me to see a

21   specialist.  I'm not sure whether that specialist was an

22   orthopedic surgeon, neurosurgeon or neurologist.  It could

23   have been any one of the three.

24       Q    Was it your understanding that referral was

25   intended to address your lower back --

83

1    Q    Sorry.  Who denied the transfer to a surgery

2  center?

3    A    As far as the referral to.  Not transfer, but a

4  referral to.

5    Q    Sorry.  A referral.

6    A    She didn't specify who they were.  She just said

7  that, you know, she had made it and then it didn't happen.

8    Q    Did Dr. Saunders or Dr. Brown ever medically

9  recommend the use of a back brace to treat your lower back

10  condition?

11    A    Without seeing the medical records, I don't know.

12  I was never given one.

13    Q    Where did you see what you've thought was black

14  mold at the Sutter County Jail?

15    A    Surrounding the ventilation duct in the cell and

16  it's when I moved in the cell with Brad Warta.

17    Q    What cell was it?

18    A    I don't remember the specific number.  It was

19  immediately adjacent to the shower.

20    Q    How long were you in that cell?

21    A    It was the last place I was housed.  I don't

22  recall how long I was in there.

23    Q    Can you give me an estimation?

24    A    I would say the last few months that I was at the

25  Sutter County Jail.

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      Q      And when you say "surrounding the ventilation
2    duct," was it a rectangle duct vent?
3      A      The duct was a square-type duct with a series of
4    holes drilled into the cover.
5      Q      And when you say "surrounding" it, what do you
6    mean?
7      A      I think I said "around."  But it was both, around
8    the perimeter, but also around the holes of the vent.
9      Q      And when you say "around the perimeter," how wide
10   was what you characterize as black mold around the
11   perimeter?
12     A      I think I claimed it was visible black film or
13   whatever and it was probably within, I'll say, four to
14   five inches around the perimeter of the vent so reaching
15   out from it and then around the holes of the vent, itself.
16     Q      So, as you sit here today, do you know whether
17   that black film was black mold or not?
18     A      Based on my experience in construction and doing
19   mold remediation, I would say that it was black mold.
20     Q      Any other place that you saw what you understood
21   to be black mold?
22     A      There were spots around the housing unit,
23   especially around the shower area, like, up in the ceiling
24   where the moisture might gather, and a few other places
25   around the registers or vents that went up to some form of

96

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    a ventilation system.

2        Q    How many spots in the shower ceiling?

3        A    It was above the shower area and it was, like, a

4    couple strip areas.  Basically, like, at the corner top of

5    a ceiling in the corner.  The shower sort of sits at an

6    angle, the top and bottom, and it was at the top above the

7    shower area.

8        Q    What's the area like; one inch by two inches, one

9    inch by 12 inches?

10       A    I would say, approximately, an inch width and,

11   maybe, ten- to 12-inch strip, and many of the vents had,

12   sort of, a blackish film around them somewhat as I

13   described before.

14       Q    How many vents did you observe that you believed

15   to have black mold on them?

16       A    In the entire time I was there?  Probably, I

17   would say, five that I had seen.

18       Q    Five vents?

19       A    Vents or vent registers where the incoming air

20   comes into the cell.

21       Q    And did they all have this four- to five-inch

22   swath around it?

23       A    Some of them are less, some of them a little bit

24   more.  Probably, on average, you know, three to four

25   inches wide.

97

David G. Leonard
July 12, 2016

1     Q     You have an allegation about being housed in an

2     upper- tier cell while at the Sutter County Jail and an

3     allegation about difficulty in negotiating the stairs.

4     A     Yes.

5     Q     Did you ever fall down the stairs?

6     A     I didn't fall.  I had difficulty going up and

7     down.  There was, obviously, a fear that I would fall.

8     Q     During your incarceration at the Sutter County

9     Jail, how many times would you say that you went to sick

10    call?

11    A     I have no idea.

12    Q     Over 20?

13    A     Probably.

14    Q     Okay.  Each of those times, you had to negotiate

15    the stairs?

16    A     Yes.

17    Q     How many times would you say that you accessed

18    the law library while at the Sutter County Jail?

19    A     Quite a few.  Specific number, I don't know.

20    Q     Over 50?

21    A     I really have no idea.  It's been too long.

22    Q     Somewhere between ten and 20?

23    A     More than ten.

24    Q     More than ten.  Okay.  Did you have to negotiate

25    the stairs each time?

98

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1      A     Yes.

2      Q     How many times did you access the recreation

3   yard?

4      A     I don't know the specific number.  Quite a few,

5   especially, when I first got there and before the

6   injections were wearing off, I was able to move freely.

7      Q     More than 20 times?

8      A     I would say yes.

9      Q     More than 50 times?

10     A     Probably.

11     Q     Okay.  How many times did you go to canteen?

12     A     Canteen was actually held in the building there

13  or in our pod area.  It was a weekly thing.

14     Q     It required you to negotiate the stairs?

15     A     Yes.

16     Q     Okay.

17     A     In general, I would say that we went, with some

18  exceptions, almost every week, once a week.

19     Q     And how many times would you say you had visitors

20  while incarcerated at the Sutter County Jail?

21     A     Pretty much, on a weekly basis.

22     Q     Was there ever a time that you did not see a

23  visitor because you could not negotiate the stairs?

24     A     Visitors, no.

25     Q     Was there ever a time that you could not
```

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    negotiate the stairs and did not go to canteen or the law

2    library, the rec. yard or anything like that?

3        A    Yes.

4        Q    Okay.  How many times did that occur?

5        A    Without seeing the notes, it's just a guess.  I'm

6    guessing, maybe, 20 times.

7        Q    And what notes are you referring to?

8        A    The notes in the calendar that I made which are

9    in the attorney file.  When I first got there, mobility

10   wasn't as much of an issue and it started coming on later.

11       Q    Did anyone say to you that you were housed in the

12   upper tier area because you had lower back issues?

13       A    That I was housed up there because of it?

14       Q    Yes.

15       A    No.  Doris Brown indicated that she had requested

16   a cell move to a lower floor because of the mobility

17   issues.

18       Q    Was it your understanding that that was a medical

19   order or simply a request?

20       A    My understanding was that it was a medical

21   recommendation or an order.

22       Q    And was it your understanding that that request

23   was based on availability?

24       A    First, was need.  And on occasion, they made what

25   we call courtesy moves.  In other words, they would move

David G. Leonard
July 12, 2016

1    BY MR. WHITEFLEET:

2        Q    I just have some more generalized questions.   Did

3    you ever use the recreation yard to play soccer?

4        A    I didn't play soccer.   I did go and walk the

5    perimeter.   And, at one point, we had a handball that we

6    would throw.   We may have, like, kicked it when it came

7    over or something.   And I saw that in your request and I

8    think they're confusing me with Pedro.

9        Q    Could be it.   You saw Pedro playing soccer?

10       A    Yes, because they had a big issue about the fact

11   that he had a leg injury and he was playing soccer.   That

12   might have been the Ultram one; I'm not sure.

13       Q    Okay.   All right.   I'm going to start marking

14   separately the inmate request forms and just have you

15   identify what the request was about.

16            (Exhibit 4 marked.)

17   BY MR. WHITEFLEET:

18       Q    So, I've marked as Exhibit 4 one that appears to

19   be dated 6-28-2009 and it appears to be a request to be

20   moved to a lower tier.

21       A    Do you want me to go ahead and describe what it

22   is?

23       Q    Yes, please.

24       A    This was a request, actually, to move to the

25   tanks I mentioned earlier, which are like more of a dorm

David G. Leonard
July 12, 2016

1    setting versus an individual cell.  And they just said to

2    put it on a request form because it wasn't for medical

3    reasons; it was just for more space.

4         Q    Okay.  So, your request that you made on June 28,

5    2009 was to move to the tanks because you wanted more

6    room?

7         A    Yeah.  They're a larger tank, maybe, a little

8    larger than this room here, that provides you more space

9    and it has its own bathroom and shower area and, like, a

10   TV, table areas.

11        Q    Okay.  And your understanding that this Sergeant,

12   looks like --

13        A    I think it's Shuck.

14        Q    -- Shuck responded to your request saying there

15   was no room at this time, but you would be kept in mind?

16        A    Yes.  My cellmate, Payden Arnold, had originally

17   been in a tank and said how much better it was, more space

18   and so forth, and we both had requested a move.

19             (Exhibit 5 marked.)

20   BY MR. WHITEFLEET:

21        Q    All right.  So, now we've marked as Exhibit 5 an

22   inmate request form dated July 1, 2009, by you and it

23   appears to be, simply, a law library request?

24        A    There's probably quite a few of those.  Yes, this

25   is, basically, I was requesting to see the law library --

103

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1        Q     Okay.  Thank you.

2              (Exhibit 6 marked.)

3   BY MR. WHITEFLEET:

4        Q     Now, I've marked as Exhibit 6 an inmate request

5   form dated July 10th, 2009, from you.  And I'm not sure

6   whether you can read this or not, but it appears to be

7   that there's some other inmates that moved to a different

8   area and it looks like you're requesting to be moved to a

9   different area.  Are you able to read that?

10       A     Not really.  I can make out bits and pieces of

11  it, but it's hard to read.

12       Q     Based on the bits and pieces that you can make

13  out, what's your understanding of the nature of the

14  request?

15       A     The inmates from, it looks like, two cells

16  have -- can't make that out.  I can't really make it out.

17       Q     Okay.  But your understanding, whatever it was,

18  that it was referred to OIC Fliehman, F-l-i-e-h-m-a-n, who

19  responded there was no room to move you at this time?

20       A     Yes, I believe this was another request to move

21  to the tank that we mentioned earlier, but I can't really

22  read it.

23             (Exhibit 7 marked.)

24  BY MR. WHITEFLEET:

25       Q     This one appears -- we've now marked as Exhibit 7

104

David G. Leonard
July 12, 2016

1    inmate request form dated the same day, July 10, 2009.

2    But my read on it appears to be a different request, but

3    what I can make out, it seems to be you're asking to be

4    moved to the max unit, maximum unit, due to some security

5    breach concern that you had.

6         A    This was the identity breach that I mentioned

7    earlier.  And I believe from what I'm reading here, this

8    was because I had had a breach of my identity, which came

9    through the mail somehow and that was addressed in the

10   first half there, and be relocated to a max unit -- I'm a

11   little confused because the A pod is, basically, a max

12   unit.  I'm trying to see where -- I was in A-10 at the

13   time and I mentioned during movement, like if you're going

14   out to court or moving within the facility, but I'm not

15   sure.  It's hard for me to see this.

16        I'm not sure, at this point, because I was in A

17   pod, which is technically, a max unit, unless we're

18   talking about moving to the max area next to the medical

19   so I wouldn't have as far to travel.  There's some max

20   cells there.  That may have been what this was; otherwise,

21   I don't recall what --

22        Q    Okay.  So, fair to say that Exhibit 7 requests to

23   be moved to a different cell for, perhaps, convenience

24   purposes?

25        A    Well, I said it was closer to medical.  So, if

1    that's the max units, that's the ones right next to

2    medical.

3        Q    Okay.

4        A    Which is in the area of the tanks, but --

5        Q    And the response by OIC Fliehman was there was no

6    room to move you at this time; is that correct?

7        A    Yes.

8        Q    And did you ever pursue that request any further

9    on this day?

10       A    On that day?  I don't believe so.  I pursued it

11   when I talked to staff through medical because I said that

12   I would need to have medical request a downstairs room.

13              (Exhibit 8 marked.)

14   BY MR. WHITEFLEET:

15       Q    Marked as Exhibit 8, a request form dated

16   July 14, 2009, and it references a civil matter, Sutter

17   County Case Number 09C300165, where it says you are pro

18   per --

19       A    Pro per.

20       Q    -- pro se.

21              My question is, what was that case?

22       A    Because I was a contractor and I was in custody,

23   I couldn't pay one of my subs, so they filed a civil case

24   and had me served while I was in county.  So, I believe

25   these were requests to make sure that I was taken out for

Atkinson-Baker Court Reporters
www.depo.com

1    BY MR. WHITEFLEET:

2        Q    Marked as Exhibit 11 a request form dated

3    July 26, 2009, appears to be just a barber and fingernail

4    request.

5        A    Yes.  They started making us fill out a request

6    to see a barber.

7        Q    Did you ever fill out a request form seeking a

8    copy of -- a blank grievance form?  In other words, did

9    you fill out a form to request a form?

10       A    At the time, the staff weren't giving me any

11   forms and the only forms I could get were med slips for

12   the nurse.

13            (Exhibit 12 marked.)

14   BY MR. WHITEFLEET:

15       Q    I'm going to try to do this in chronology, but it

16   looks like I missed a few dates.  Marked as Exhibit 12,

17   inmate request form dated July 21st, 2009.  And it appears

18   that you're asking that a doctor be made aware that you

19   were allergic to types of mold?

20       A    Yes.  I think I even sent you a copy of this one

21   or one like it.  This is, basically, advising I wanted to

22   make sure that they were aware that I had the allergy to

23   mold, allergies in general, and --

24       Q    Is there anywhere in this request form where you

25   identify any particular areas where you observed mold?

108

David G. Leonard
July 12, 2016

1      A     I hadn't actually at that time.  In fact, I put

2   in here, I believe, that I wasn't presenting with symptoms

3   either at that time.

4      Q     And the response?

5      A     Was that it was noted.

6      Q     That mold allergies noted on medical chart.

7   Custody advised of mattress recommendations or make a

8   recommendation.

9      A     Yeah, that was a nurse practitioner made a

10  request for a second or double mattress.

11     Q     And do you know whether that was a medical

12  recommendation or --

13     A     It was listed and I was explained that it was a

14  medical request and I was provided a printout where

15  custody denied that request.  And I sent that to you as

16  part of my admissions.

17     Q     Was it your understanding that that request for a

18  second mattress was depending on whether custody allowed

19  it or not?

20     A     I believe they said, if okay with custody, I

21  think, is how they worded it.

22     Q     Okay.  Do you know why custody denied it?

23     A     They just said it wasn't okay.  I asked them and

24  they couldn't provide a reason.

25     Q     Did you ever learn of any reason why a second

1　mattress was denied by custody?

2　　A　　No.  In fact, my neighbor, when I was in the cell

3　next to the shower, actually had a thicker mattress, a

4　newer mattress.

5　　Q　　Who was that?

6　　A　　I would have to try to find his name.  He

7　transferred to CDCR at the same time that I did.

8　　Q　　As you sit here today, can you remember his name?

9　　A　　No.  I can visualize him.  I can't remember his

10　name.

11　　　　(Exhibit 13 marked.)

12　BY MR. WHITEFLEET:

13　　Q　　Okay.  Marked as Exhibit 13 an inmate request

14　form dated July 21st, 2009.  And the way I -- I'm going to

15　give this to you to look at and I'll look at another copy.

16　It appears that you're asking to be moved to max unit

17　again.

18　　A　　This is another request, I believe, to move to

19　the tanks that I mentioned earlier.

20　　Q　　Why were you asking to move to the tanks?

21　　A　　Again, they were more space, they were open.  You

22　have access to the showers, pretty much, all day.  They

23　have an all day rec. room and it's on the ground floor

24　next to medical.  It says, also, "The doctor also advised

25　me that I would be" something "to schedule outside medical

110

David G. Leonard
July 12, 2016

1     care when I was housed" --

2          Q     Does it say "easier to schedule"?

3          A     I think it says "easier."  I think, what they did

4     is, at one point, the staff told me that it was easier for

5     them if I was in the tank.  For one, they didn't shackle

6     you up during movement and such so that you were right

7     there next to medical, so you get easier care and I

8     believe that's what it's saying.

9          Q     Okay.  And the response -- it doesn't say who

10    signed this under the sergeant line, but the response

11    says, "You are housed appropriate for your charges"; is

12    that correct?

13         A     Yes.  However, the guys in the tanks had the same

14    charges, according to the staff that moved us there the

15    one time and moved us out.

16         Q     Who was that?

17         A     I believe it was Officer Benttencort who handled

18    the transfer, but I'm not sure.  They just came in and

19    told us to pack up and move to a tank.  And then, a short

20    time later, when my cellmate before had the issue, they

21    moved us back so I'd be housed with him.

22               (Exhibit 14 marked.)

23    BY MR. WHITEFLEET:

24         Q     I'll mark next in order 14 inmate request form

25    and I can't tell the month of the request.  Appears to be

111

David G. Leonard
July 12, 2016

1    02-09 and I'm going to presume that's in August, but I

2    cannot tell what the nature of the request is.

3         A    I can only make out bits and pieces of it.

4         Q    The response is something about getting you

5    socks, but I --

6         A    I think, what it was is the upper part's dealing

7    with the fact that I had -- the shoes they issue there had

8    problems and I needed a pair of shoes.  The bottom part

9    says something about I should have been -- should have

10   received additional pair of socks at intake.

11        Oh, they didn't provide me extra socks.  They

12   were out at intake.  And it looks like this is 8-2-09.  I

13   think you were trying to figure out the date.

14        (Exhibit 15 marked.)

15   BY MR. WHITEFLEET:

16        Q    Okay.  Thank you.  All right.  I'll mark this 15,

17   inmate request form dated August 22nd, 2009.  It appears

18   to be just about some missing clothes?

19        A    Yes.  Basically, laundry had a habit of breaking

20   open the bags and clothes disappeared.

21        (Exhibit 16 marked.)

22   BY MR. WHITEFLEET:

23        Q    Next Exhibit 16, inmate request form appears to

24   be September 9, 2009 where you're asking for a

25   confidential phone call.

1    Lieutenant Bidwell, Exhibit 1?

2        A    That was part of it, yes.  I wasn't getting

3    anywhere with medical and condition was pretty urgent with

4    the eyes.

5        Q    Okay.  And who is the nursing staff that told you

6    not to fill out any more sick slips?

7        A    I don't know her name.  I don't believe she was

8    even wearing a name tag at the time.

9        Q    So, how do you know she was nursing staff?

10       A    She was doing pill call.

11       Q    So, the reference to the sick slips was specific

12   to your eye infection?

13       A    No.  Actually, she was tired of me filling out

14   med slips.  And the most urgent condition, because of the

15   potential permanent loss of vision, was the eye.  The

16   other was a painful condition, but my main concern was

17   saving my eye.  I believe, at least, one of those med

18   slips just before that was both, the eye and my back, and

19   one prior to that was with the back, the eye and medical

20   history.  And I think I've sent you all five of those, as

21   far as the documents I sent you already.

22       Q    In relation to the ventilation system, what other

23   contaminants do you believe you were exposed to while

24   incarcerated at the Sutter County Jail, other than mold?

25       A    At one point, it appeared that they were cleaning

117

David G. Leonard
July 12, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    the swamp coolers above and there was debris falling down.

2    That debris was dark in color, sort of, looked like

3    remnants of an asphalt-type roof.  That's the best I can

4    describe it.  There was, obviously, some type of dirt or

5    dust debris in there, as well, but I don't know if there

6    were any cleaning chemicals while they were working on it

7    or not.

8           You could hear, like, the shovels and things up

9    above, and you could see, like, dust, you know, coming

10   through.  But, you know, I wasn't in a position to test

11   any of it or so forth.  We told the staff that was on.

12   Q    How many times were you aware of sounds that you

13   associated with cleaning the swamp coolers?

14   A    I'm not really sure.  One occurrence

15   specifically, you know, stands out, but I believe that it

16   occurred over a few-day period and it was during one block

17   of time towards the end of the time I think I was there.

18   Q    So, was it just the one few-day period toward the

19   end of your incarceration that you recall any swamp

20   coolers being cleaned?

21   A    That was the only time that I recall any type of

22   cleaning or maintenance done.

23   Q    Okay.  And did you have an asthma attack after

24   being near the debris from the cleaning the swamp cooler?

25   A    I'm not exactly sure on the date.  It may have

118

David G. Leonard
July 12, 2016

1    STATE OF CALIFORNIA                          )
                                                  )   SS.
2    COUNTY OF _____)

3

4

5

6

7            I, the undersigned, declare under penalty of

8    perjury that I have read the foregoing transcript, and I

9    have made any corrections, additions or deletions that I

10   was desirous of making; that the foregoing is a true and

11   correct transcript of my testimony contained therein.

12

13           EXECUTED this _____ day of _____,

14   2016, _____ at _____.
                        (City)                        (State)

15

16

17              _____
                DAVID G. LEONARD
18

19

20

21

22

23

24

25

                                                                    122

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4          I, Arleen Jimenez, CSR No. 4240, a Certified

 5   Shorthand Reporter, certify;

 6          That the foregoing proceedings were taken before

 7   me at the time and place therein set forth, at which time

 8   the witness was put under oath by me;

 9          That the testimony of the witness, the questions

10   propounded, and all objections and statements made at the

11   time of the examination were recorded stenographically by

12   me and were thereafter transcribed;

13          That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15          I further certify that I am not a relative or

16   employee of any attorney of the parties, nor financially

17   interested in the action.

18          I declare under penalty of perjury under the laws

19   of California that the foregoing is true and correct.

20          Dated this 26th day of July, 2016.

21   (Signature requested.)

22

23

24          _____

25          Arleen Jimenez, CSR No. 4240
```

123

David G. Leonard
July 12, 2016

Exhibit B

John R. Whitefleet
Attorney at Law
Porter - Scott
A Professional Corporation
350 University Avenue, Suite 200
Sacramento, CA 95825



August 12, 2016

Re: Supplementation Requested Items (Letters) and Protective Order

Mr. Whitefleet,

    I recently received your letter dated July 27, 2016 pertaining
to the PROTECTIVE ORDER and the request for letters and notes to
the Defendants in this matter.  During the deposition, you also ask-
ed why I sent more than one (1) NOTICE OF CLAIM, to the Defendants.
In response to that question, I would like to add, amend, correct or
supplement my response.  The response or answer should have indicat-
ed that I sent a follow-up letter/NOTICE OF CLAIM as I had not receiv-
ed any response to my first NOTICE (Letter) and had been transfered
from Mule Creek State Prison (P.O. Box 409000; 4001 Highway 104,
Ione, CA 95640) to Avenal State Prison (B-210-1-1-6L, P.O. Box 900;
#1 Kings Way, Avenal, CA 93204).

    In addition to the two (2) NOTICE OF CLAIMs or letters, I believe
there may have been one (1) additional set of correspondence letters
sent to the Defendants.  I am in the process of trying to locate any
further letters or notes pertaining to this request, and will supple-
ment this production upon locating or receiving any additional docu-
ments, letters, or notes.

    In response to your request and agreement to provide the NOTICE
OF CLAIMS/Letters, please find enclosed the following items:

        (a) J. Saunders M.D. Letter dated September 1, 2010 with Proof
            Proof of Service

        (b) Doris Brown (erroneously Dorris Brown) N.P. Letter dated
            September 1, 2010 with Proof of Service

        (c) Sutter County Sheriff / Sutter Counsel Letter dated Septem-
            ber 1, 2010 with Proof of Service (Sutter County Counsel)

- 1 -

(d) Sutter County Sheriff / Sutter Counsel Letter dated September 1, 2010 with Proof of Service (Sutter County Sheriff)

(e) J. Saunders, M.D. Letter dated December 26, 2011 with Proof of Service

(f) Doris Brown (erroneously Dorris Brown) N.P. Letter dated December 26, 2011 with Proof of Service

(g) Sutter County Sheriff / Sutter County Counsel Letter dated December 26, 2011 with Proof of Service (Sutter County Counsel)

(h) Sutter County Sheriff / Sutter County Counsel Letter dated December 26, 2011 with Proof of Service (Sutter County Sheriff)


Thank you for the reminder letter as we discussed regarding the above referenced items. When I receive the transcripts for review, I will incorporate the correction, addition, amendment referenced above.

As to the matter of the PROTECTIVE ORDER and STIPULATION, I had previously sent you a draft order and stipulation, as I had not yet received your draft copy provided with the July 27, 2016 correspondence (Reminder). Unfortunately, we do not have the ability to directly communicate, and the Institutional Mail Delays have created some issues. I had an opportunity to review the Draft Copy that you provided, and have drafted a revised or amended PROTECTIVE ORDER using your Draft Copy as a template, with a few changes which I believe will be agreeable to you. I am enclosing a copy of the new PROTECTIVE ORDER, as well as a separate ORDER pertaining to the use of my Social Security Information as we discussed. Please review the enclosed PROTECTIVE ORDERs and if agreeable to you, please sign and return the signed copy to me. I will enclose a self-addressed, stamped-envelope for your convenience. Thank you in adavnce for your cooperation in this matter.

Respectfully,

David G. Leonard

David G. Leonard
CDCR No. AC-9689
CIM II, West-CH, 131-L
P.O. Box 368
Chino, CA 91708

**NOTICE OF CLAIM LETTERS**

(SUPPLEMENTAL REQUESTED INFORMATION)

J. Saunders, M.D.
Sutter County Jail
1077 Civic Center Boulevard
Yuba City, CA 95993


September 1, 2010


Re: Notice of Intent to file a civil claim for damages, pursuant
    to California Code of Civil Procedure, section 364(a) for med-
    ical malpractice, and Notice of Claim


Mr. Saunders,
     This letter serves as written notice pursuant to California
Code of Civil Procedure, section 364(a), of the intent to file a
malpractice lawsuit for monetary damages, regarding your care.
     This letter further serves as NOTICE OF CLAIM and intent to
file a civil claim with the State of California, or Federal Court
(U.S. District Court), for conduct and actions constituting Cruel
and Unusual Punishment, as well as, other civil rights violations.
     A complaint regarding specific allegations of malpractice will
be filed with the Medical Board of California, along with a copy of
this notice.
     The basis of my claims shall include, but is not limited to:
(1) Cruel and Unusual Punishment; (2) Deliberate Indifference to
Serious Medical Needs; (3) A failure to diagnose and treat; (4)
Failure to comply with Medical Protocols and Standards of Care, and;
(5) a failure to provide timely medical care, referrals to special-
ist providers and necessary diagnostics, or reasonable accomodations.


                                        Respectfully,

                                        David G. Leonard


David G. Leonard
AC-9689
4001 Highway 104
P.O. Box 409000
Ione, CA 95640

Proof of Service by Mail

I, _Thomas Scott_, Declare:

I am over eighteen (18) years of age, and not a party to this action, my ( ) Business or (✓) Residence Address is:

_Thomas Scott_

_4001 Highway 104_

_Ione, CA 95640_

On this _1st_ day of _September_, _2010_ I personally placed in to the United States Postal Service Box, or designee thereof, a copy of the below described documents, sealed and affixed with proper first class postage from:

_David G. Leonard_           _Ione, CA 95640_

_CDCR No. AC-9689_

_P.O. Box 409000_

The following items described as:

_Notice of Intent to file a Civil Claim, Code of Civil Procedure Notice (Section 364(a)), Notice of Claim_

Mailed to the address/person(s) listed as follows:

_J. Saunders, M.D._           _Yuba City, CA 95993_

_Sutter County Jail_

_1077 Civic Center Boulevard_

I declare under penalty of perjury, under the Laws of the State of California, the foregoing is true and correct.

Dated: _09/01/2010_       Signature: _Thomas Scott_

Printed Name: _Thomas Scott_

Dorris Brown, N.P.
Sutter County Jail
1077 Civic Center Boulevard
Yuba City, CA 95993


September 1, 2010


Re: Notice of Intent to file a civil claim for monetary damages,
    pursuant to California Code of Civil Procedure section 364(a)
    for medical malpractice, and Notice of Claim


Dorris Brown,

This letter serves as written notice pursuant to California Code of Civil Procedure, section 364(a), of the intent to file a malpractice lawsuit for monetary damages against you.

This letter further serves as NOTICE OF CLAIM, and intent to file a civil claim within the State of California, or Federal Court (U.S. District Court), for conduct and actions constituting Cruel and Unusual Punishment, as well as, other civil rights violations.

A complaint regarding specific allegations of malpractice will be filed with the Board of Nursing, along with a copy of this notice.

The basis of my claims shall include, but is not limited to: (1) Cruel and Unusual Punishment; (2) Deliberate Indifference to Serious Medical Needs; (3) A failure to diagnose and treat; (4) Failure to comply with Medical Protocols and Standards of Care, and; (5) a failure to provide timely medical care, referrals to specialist providers and necessary diagnostics, or reasonable accomodations.

Respectfully,

David G. Leonard

David G. Leonard
AC-9689
4001 Highway 104
P.O. Box 409000
Ione, CA 95640

## Proof of Service by Mail

I, *Thomas Scott*, Declare:

I am over eighteen (18) years of age, and not a party to this action, my ( ) Business or (✓)
Residence Address is:

*Thomas Scott*

*4001 Highway 104*

*Ione, CA 95640*

On this *1st* day of *September*, *2010* I personally placed in to the
United States Postal Service Box, or designee thereof, a copy of the below described documents,
sealed and affixed with proper first class postage from:

*David G. Leonard*        *Ione, CA 95640*

*CDCR No. AC-9689*

*P.O. Box 409000*

The following items described as:

*Notice of Intent to file a Civil Claim, Code of Civil
Procedure Notice (Section 364(a)), Notice of Claim*

Mailed to the address/person(s) listed as follows:

*Dorris Brown, N.P.*        *Yuba City, CA 95993*

*Sutter County Jail*

*1077 Civic Center Boulevard*

I declare under penalty of perjury, under the Laws of the State of California, the foregoing is true
and correct.

Dated: *09/01/2010*        Signature: *Thomas Scott*

Printed Name: *Thomas Scott*

Sutter County Sheriff
Sutter Counsel
c/o Sutter County Jail
1077 Civic Center Boulevard
Yuba City, CA 95993


September 1, 2010


Re:  Notice of Intent to file a civil claim for damages, pursuant to
     California Code of Civil Procedure Section 364(a) for medical
     malpractice, and Notice of Claim for monetary damages

Party of Interest,

    This letter serves as written notice pursuant to California
Code of Civil Procedure, Section 364(a), of the intent to file a
malpractice lawsuit for monetary damages, regarding the care of
Dorris Brown, Nurse Practitioner (N.P.); and J. Saunders, Medical
Doctor (M.D.).

    This letter further serves notice as NOTICE OF CLAIM, and in-
tent to file a civil claim within the Sate of California, or Fed-
eral Court (U.S. District Court), for the conduct and actions con-
stituting Cruel and Unusual Punishment, as well as, other civil
rights violations.

    A complaint regarding specific allegations of malpractice
will be filed with the Medical Board of California, and the Board
of Nursing, along with a copy of this notice or subsequent notice.

    The basis of my claims shall include, but is not limited to:
(1) Cruel and Unusual Punishment; (2) Deliberate Indifference to
Serious Medical Needs; (3) A failure to diagnose and treat; (4)
Failure to comply with Medical Protocols and Standards of Care,
and; (5) a failure to provide timely medical care, referrals to
specialist providers or provide necessary diagnostics, and reason-
able accommodations.


                                    Respectfully,

                                    David G. Leonard

                                    David G. Leonard


David G. Leonard
AC-9689
4001 Highway 104
P.O. Box 409000
Ione, CA 95640

Proof of Service by Mail

I, _Thomas Scott_ , Declare:

I am over eighteen (18) years of age, and not a party to this action, my ( ) Business or (✓)
Residence Address is:

_Thomas Scott_

_4001 Highway 104_

_Ione, CA 95640_

On this _1st_ day of _September_ , _2010_ I personally placed in to the
United States Postal Service Box, or designee thereof, a copy of the below described documents,
sealed and affixed with proper first class postage from:

_David G. Leonard_      _Ione, CA 95640_

_CDCR No. AC-9689_

_P.O. Box 409000_

The following items described as:

_Notice of Intent to file a Civil Claim, Code of Civil_
_Procedure Notice (section 364(a)), Notice of Claim_

Mailed to the address/person(s) listed as follows:

_Sutter County Counsel_      _Yuba City, CA 95993_

_C/o Sutter County Jail_

_1077 Civic Center Boulevard_

I declare under penalty of perjury, under the Laws of the State of California, the foregoing is true
and correct.
Dated: _09/01/2010_      Signature: _Thomas Scott_

Printed Name: _Thomas Scott_

Sutter County Sheriff
Sutter Counsel
c/o Sutter County Jail
1077 Civic Center Boulevard
Yuba City, CA 95993

September 1, 2010

Re:   Notice of Intent to file a civil claim for damages, pursuant to
      California Code of Civil Procedure Section 364(a) for medical
      malpractice, and Notice of Claim for monetary damages

Party of Interest,

This letter serves as written notice pursuant to California
Code of Civil Procedure, Section 364(a), of the intent to file a
malpractice lawsuit for monetary damages, regarding the care of
Dorris Brown, Nurse Practitioner (N.P.); and J. Saunders, Medical
Doctor (M.D.).

This letter further serves notice as NOTICE OF CLAIM, and in-
tent to file a civil claim within the Sate of California, or Fed-
eral Court (U.S. District Court), for the conduct and actions con-
stituting Cruel and Unusual Punishment, as well as, other civil
rights violations.

A complaint regarding specific allegations of malpractice
will be filed with the Medical Board of California, and the Board
of Nursing, along with a copy of this notice or subsequent notice.

The basis of my claims shall include, but is not limited to:
(1) Cruel and Unusual Punishment; (2) Deliberate Indifference to
Serious Medical Needs; (3) A failure to diagnose and treat; (4)
Failure to comply with Medical Protocols and Standards of Care,
and; (5) a failure to provide timely medical care, referrals to
specialist providers or provide necessary diagnostics, and reason-
able accommodations.

Respectfully,

David G. Leonard

David G. Leonard
AC-9689
4001 Highway 104
P.O. Box 409000
Ione, CA 95640

Proof of Service by Mail

I, _Thomas Scott_ , Declare:

I am over eighteen (18) years of age, and not a party to this action, my ( ) Business or (✓) Residence Address is:

_Thomas Scott_

_4001 Highway 104_

_Ione, CA 95640_

On this _1st_ day of _September_ , _2010_ I personally placed in to the United States Postal Service Box, or designee thereof, a copy of the below described documents, sealed and affixed with proper first class postage from:

_David G. Leonard_          _Ione, CA 95640_

_CDCR No. AC-9689_

_P.O. Box 409000_

The following items described as:

_Notice of Intent to file a Civil Claim, Code of Civil Procedure Notice (Section 364(a)), Notice of Claim_

Mailed to the address/person(s) listed as follows:

_Sutter County Sheriff_          _Yuba City, CA 95993_

_C/o Sutter County Jail_

_1077 Civic Center Boulevard_

I declare under penalty of perjury, under the Laws of the State of California, the foregoing is true and correct.

Dated: _09/01/2010_          Signature: _Thomas Scott_

Printed Name: _Thomas Scott_

J. Saunders M.D.
Sutter County Jail
1077 Civic Center Boulevard
Yuba City, CA 95993


December 26, 2011

Re: Notice of Intent to file a civil claim for monetary damages, pursuant
    to California Code of Civil Procedure Section 364(a) for medical
    malpractice, and Notice of Claim


    This letter serves as written notice pursuant to California Code
of Civil Procedure, Section 364(a), of the intent to file a malpractice
lawsuit seeking monetary damages.
    This letter further serves as NOTICE OF CLAIM, and intent to file
a civil claim within the State of California, or Federal Court, for the
conduct and actions constituting Cruel and Unusual Punishment, as well
as, other civil rights violations.
    A complaint regarding specific allegations of malpractice will be
filed with the Medical Board of California and Nursing Board, in addition
to a copy of this notice.
    The basis of said claims shall include, but are not limited to: (1)
Deliberate Indifference to Serious Medical Needs; (2) Cruel and Unusual
Punishment; (3) A Failure to Diagnose and Treat; (4) Failure to comply
with Medical Protocols and Standards of Care; (5) a failure to provide
adequate medical care, and; (6) a failure to provide timely referrals
to specialist providers.

                              Respectfully,

                              David G. Leonard

David G. Leonard
AC-9689
B-210-1-1-6L
P.O. Box 900
Avenal, CA 93204

cc. Legal File

**Proof of Service by Mail**

I, _Keith Carlen_, Declare:

I am over eighteen (18) years of age, and not a party to this action, my ( ) Business or (✓) Residence Address is:

_Keith Carlen_

_#1 Kings Way_

_Avenal, CA 93204_

On this _18th_ day of _January_, _2012_ I personally placed in to the United States Postal Service Box, or designee thereof, a copy of the below described documents, sealed and affixed with proper first class postage from:

_David Leonard_          _P.O. Box 9_

_AC-9689_                _Avenal, CA 93204_

_B-240-1-1-6L_

The following items described as:

_Notice of claim (malpractice) Civil Action_

Mailed to the address/person(s) listed as follows:

_J. Saunders M.D._          _Yuba City, CA 95993_

_Sutter County Jail_

_1077 Civic Center Blvd._

I declare under penalty of perjury, under the Laws of the State of California, the foregoing is true and correct.

Dated: _1/18/2012_  Signature: _Keith Carlen_

Printed Name: _KEITH A. CARLEN_

Dorris Brown N.P.
Sutter County Jail
1077 Civic Center Boulevard
Yuba City, CA 95993


December 26, 2011

Re: Notice of Intent to file a civil claim for monetary damages, pursuant
    to California Code of Civil Procedure Section 364(a) for medical
    malpractice, and Notice of Claim


    This letter serves as written notice pursuant to California Code
of Civil Procedure, Section 364(a), of the intent to file a malpractice
lawsuit seeking monetary damages.
    This letter further serves as NOTICE OF CLAIM, and intent to file
a civil claim within the State of California, or Federal Court, for the
conduct and actions constituting Cruel and Unusual Punishment, as well
as, other civil rights violations.
    A complaint regarding specific allegations of malpractice will be
filed with the Medical Board of California and Nursing Board, in addition
to a copy of this notice.
    The basis of said claims shall include, but are not limited to: (1)
Deliberate Indifference to Serious Medical Needs; (2) Cruel and Unusual
Punishment; (3) A Failure to Diagnose and Treat; (4) Failure to comply
with Medical Protocols and Standards of Care; (5) a failure to provide
adequate medical care, and; (6) a failure to provide timely referrals
to specialist providers.


                                        Respectfully,

                                        David G. Leonard

David G. Leonard
AC-9689
B-210-1-1-6L
P.O. Box 900
Avenal, CA 93204


cc. Legal File

**Proof of Service by Mail**

I, _Keith Carlen_ , Declare:

I am over eighteen (18) years of age, and not a party to this action, my ( ) Business or (✓) Residence Address is:

_Keith Carlen_

_#1 Kings Way_

_Avenal, CA 93204_

On this _18th_ day of _January_ , _2012_ I personally placed in to the United States Postal Service Box, or designee thereof, a copy of the below described documents, sealed and affixed with proper first class postage from:

_David Leonard_          P.O. Box 900

_AC-8689_               Avenal, CA 93204

_B-210-1-1-6L_

The following items described as:

_Notice of Claim (Malpractice) Civil Action_

_____

Mailed to the address/person(s) listed as follows:

_Dorris Brown N P_        Yuba City, CA 95993

_Sutter County Jail_

_1077 Civic Center Blvd._

I declare under penalty of perjury, under the Laws of the State of California, the foregoing is true and correct.

Dated: _1/18/2012_   Signature: _Keith Carl_

Printed Name: _KEITH A CARLEN_

Sutter County Sheriff
Sutter County Counsel
c/o Sutter County Jail
1077 Civic Center Boulevard
Yuba City, CA 95993

December 26, 2011

Re: Notice of Intent to file a civil claim for damages, pursuant to
    California Code of Civil Procedure Section 364(a) for medical
    malpractice, and Notice of Claim for monetary damages

Party of Interest,

     This letter serves as written notice pursuant to California Code
of Civil Procedure, Section 364(a), of the intent to file a malpractice
lawsuit for monetary damages, regarding the care of Dorris Brown, N.P;
and J. Saunders, M.D.

     This letter further serves notice as NOTICE OF CLAIM, and intent
to file a civil claim within the State of California, or Federal Court,
for the conduct and actions constituting Cruel and Unusual Punishment,
as well as, other civil rights violations.

     A complaint regarding specific allegations of malpractice will be
filed with the Medical Board of California and Nursing Boards, along
with a copy of this notice.

     The basis of said claim shall include, but is not limited to: (1)
Deliberate Indifference to Serious Medical Needs; (2) Cruel and Unusual
Punishment; (3) A failure to diagnose and treat; (4) Failure to comply
with Medical Protocols and Standards of Care, and; (6) a failure to
provide timely referrals to specialst providers and care.

                                        Respectfully,

                                        David G. Leonard

David G. Leonard
AC-9689
B-210-1-1-6L
P.O. Box 900
Avenal, CA 93204

cc.  Legal File
     Sutter County Sheriff
     Sutter County Counsel

# Proof of Service by Mail

I, _Keith Carlen_ , Declare:

I am over eighteen (18) years of age, and not a party to this action, my ( ) Business or (✗) Residence Address is:

_Keith Carlen_

_#1 Kings Way_

_Avenal, CA 93204_

On this _18th_ day of _January_ , _2012_ I personally placed in to the United States Postal Service Box, or designee thereof, a copy of the below described documents, sealed and affixed with proper first class postage from:

_David Leonard_          _P.O. Box 9_

_AC 9689_                _Avenal, CA 93204_

_B-210-1-1-6L_

The following items described as:

_Notice of class (malpractice) Civil Claims_

Mailed to the address/person(s) listed as follows:

_Sutter County Counsel_      _Yuba City, CA 95993_

_c/o Sutter County Jail_

_1022 Civic Center Blvd._

I declare under penalty of perjury, under the Laws of the State of California, the foregoing is true and correct.

Dated: _1/18/2012_   Signature: _Keith A Carlen_

Printed Name: _KEITH A. CARLEN_

Sutter County Sheriff
Sutter County Counsel
c/o Sutter County Jail
1077 Civic Center Boulevard
Yuba City, CA 95993


December 26, 2011


Re: Notice of Intent to file a civil claim for damages, pursuant to
    California Code of Civil Procedure Section 364(a) for medical
    malpractice, and Notice of Claim for monetary damages


Party of Interest,

      This letter serves as written notice pursuant to California Code
of Civil Procedure, Section 364(a), of the intent to file a malpractice
lawsuit for monetary damages, regarding the care of Dorris Brown, N.P;
and J. Saunders, M.D.

      This letter further serves notice as NOTICE OF CLAIM, and intent
to file a civil claim within the State of California, or Federal Court,
for the conduct and actions constituting Cruel and Unusual Punishment,
as well as, other civil rights violations.

      A complaint regarding specific allegations of malpractice will be
filed with the Medical Board of California and Nursing Boards, along
with a copy of this notice.

      The basis of said claim shall include, but is not limited to: (1)
Deliberate Indifference to Serious Medical Needs; (2) Cruel and Unusual
Punishment; (3) A failure to diagnose and treat; (4) Failure to comply
with Medical Protocols and Standards of Care, and; (6) a failure to
provide timely referrals to specialst providers and care.


                                        Respectfully,

                                        David G. Leonard


David G. Leonard
AC-9689
B-210-1-1-6L
P.O. Box 900
Avenal, CA 93204

cc.  Legal File
     Sutter County Sheriff
     Sutter County Counsel

**Proof of Service by Mail**

I, _Keith Carlen_, Declare:

I am over eighteen (18) years of age, and not a party to this action, my ( ) Business or (✗) Residence Address is:

_Keith Carlen_

_#1 Kalaga Way_

_Avenal, CA 93204_

On this _18th_ day of _January_, _2012_ I personally placed in to the United States Postal Service Box, or designee thereof, a copy of the below described documents, sealed and affixed with proper first class postage from:

_David Leonard_      _P.O. Box 9_

_AC-9689_      _Avenal, CA 93204_

_B-210-1-1-62_

The following items described as:

_Notice of Claim (malpractice) Civil Action_

Mailed to the address/person(s) listed as follows:

_Sutter County Sheriff_      _1077 Civic Center Blvd._

_℅ Sutter County Jail /_      _Yuba City, CA 95993_

_Sheriff's office_

I declare under penalty of perjury, under the Laws of the State of California, the foregoing is true and correct.

Dated: _1/18/2012_      Signature: _Keith Carlen_

Printed Name: _KEITH A. CARLEN_

**Case Name:   Leonard v. Denny, et al.**
**Case No:        2:12-cv-00915 AC**

## DECLARATION OF SERVICE

I am a citizen of the United States and employed in Sacramento County, California; I am over the age of 18 years and not a party to the within action; my business address is 350 University Avenue, Suite 200, Sacramento, California 95825.

On the date below, I caused to be served the attached:

### DECLARATION OF JOHN WHITEFLEET IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

____X____    **BY MAIL:** I caused such envelope with postage thereon fully prepaid to be placed in the United States mail at Sacramento, California.

_____    **BY PERSONAL SERVICE:** I caused such document to be delivered by hand to the office of the person(s) listed below.

_____    **BY OVERNIGHT DELIVERY:** I caused such document to be delivered overnight to the office of the person(s) listed below.

_____    **BY FACSIMILE:** I caused such document to be transmitted by facsimile machine to the office of the person(s) listed below.

Addressed as follows:

David G. Leonard
CDCR No. AC-9689
CIM II, West - CH, 141-L
P.O. Box 368
Chino, CA 91708

I declare under penalty of perjury that the foregoing is true and correct and was executed on August 28, 2018, in Sacramento, California.

/s/ Jessica Walker
Jessica Walker

3

**DECLARATION OF JOHN WHITEFLEET IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
{01747249.DOC}